We want to welcome everyone to our argument calendar this morning in Honolulu. It's a privilege to be hearing cases here in Hawaii. We have several matters that were submitted on the briefs. Hay v. Bondi, Reyes v. Selleck, United States v. Galvan, Banta v. Hayashi. Those matters are submitted, and we'll turn to the first case on the argument calendar, Chang v. United States. Thank you. Good morning. I am Bruce Burline. Excuse me. Let me start over. My name is Bruce Burline. I represent Mr. Chang. I would like to reserve three minutes for rebuttal, please. This case is about the application of the discretionary function exception to the Federal Tort Claims Act, which is, admittedly, by this court and even the Supreme Court, a seemingly difficult doctrine to apply consistently throughout the various opinions. When evaluating the DFE, the discretionary function exception, as it affects the FTCA, the FTCA is to be construed liberally while the DFE is to be construed narrowly. This is important because of the intricacies involved in the application of the DFE as it affects the trial court's jurisdiction. In this case, Mr. Chang was playing with his children at American Memorial Park, a national park located in Saipan in the Commonwealth of the Northern Marias Islands. It's a fairly large park. The important thing to understand here is this case deals with a very small part of the park, a grassy field that is flat, used by people to play ultimate frisbee, touch football, kickball, even fly kites. It's a man-made lawn, if you will? It's not a natural lawn? It is. You can see by the pictures, but we're definitely a tropical island, so it's a pretty flat, grassy field that requires mowing and maintenance. It's kind of surrounded by sidewalks, but it's generally flat. What does the record show that people use it for? Sports or other games? I think there's a declaration with Ms. Alberti and I think the parties agree that it's multipurpose. Sports, family picnics, kids, and there were pictures of even some activities for cultural events and stuff like that. Council, was this field cleared by the government or was it always existing there and they just thought, let's just go ahead and use it for that since there's no trees obstructing in the middle? I've been there 20-plus years. I played ultimate frisbee on it. It's been there a very long time. It's been remodeled a little bit. How so? Good question. The field has always been there. There was a parking lot that came in to kind of the side. They paved it and put some lights there. The playing surface is flat. There is some hills that go up, and of course you don't really play on that. There are undulations. It's not like a football field. It's not flat like a soccer field, but you can play sports on it. Let me ask you this, Council. In your opinion, then, is the government liable for any injury caused by a natural occurrence in the flat area? Well, certainly in Mr. Chang's case, I believe so because the DFE, if that's what we're dealing with, if you're referring to does the DFE apply, it just doesn't apply in this case because Mr. Tagawa had marching orders by the park to say, go mow it, inspect it, if you see something, fill it. They call it imperfections. Holes, dips, whatever, they were instructed to fill it with soil or rocks or a combination to keep it flat so people can continue to play on it. So in that aspect, if there is a hole, it's because Mr. Tagawa failed to do his duty, to do what he was instructed and trained to do. This report obviously had a different perspective. Yes. It said it was about the design of the park rather than the implementation. So how do you respond to that? Yes. The design, in my mind, is when the people in the know, in the power, maybe Ms. Alberti, said, Mr. Tagawa, we're going to train you on how to inspect the grassy field and fill it, fill the imperfections that you find. That's the design. That's where the DFE comes in. That's where they have discretion. You can decide whatever you want to do for the park. You want to maintain it? Great. You don't want to maintain it? That's fine, too. But once you tell somebody or you decide on a plan, the case law of this circuit is pretty clear that once the policy is in place, then the DFE doesn't apply to the implication of it. I believe that's Turbush. In Meyer v. U.S., this court stated that implementation of a course of action is not a discretionary function. In Turbush, the decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. Basically, a failure to do what has already been decided to be done is not protected by the DFE. That's one of the big problems in the government's case here. You can find that in a case called Wisnant v. United States, 400 F. 3rd, 1177. The design of a course of governmental action is shielded by the discretionary function exception. The implementation of that course of action is not. Here's what the district court said on this point. It says the court finds that even though AMP employees do undertake inspection of the grassy AMP areas, how they choose to do so, how often, and the standard to which they choose to keep the grassy areas still does not fall under the design implementation distinction because these decisions necessarily require decisions based on public policy concerns. I take it you disagree with that. I do. I do. I think we're all aware that it's the government's burden. Once the plaintiff's complaint is shown to, and this is always a difficult standard, but to allege facts in a way that do not fall within the DFE, that's the plaintiff showing, basically. Then it flips to the government to prove that the DFE applies. In other words, somebody has to make a choice, and that choice involves policies and the balancing of policies. Here, Tagawa said, go mow the lawn. There is no discretion whatsoever. Mow the lawn and inspect for imperfections, and if you find them, fill them with rock and soil. There's no evidence that the government's brought to show that there's any discretion by Mr. Tagawa whatsoever. Maybe he has some discretion about 80% rock and 20% soil, but not even Mr. Tagawa says in his declaration that he had any kind of discretion. He had to fill that thing, that imperfection, with rock, soil, or some combination of either. What does the record show about how deep the hole was? I'm sorry? What does the record show about how deep this hole was? One foot. Were there other holes like that on the grassy area, or was that the only one? Well, according to the government, they didn't have any record of any other holes, and I don't have any information of any other holes, at least in the record. Council, you were stating earlier about discretion and who has it and who doesn't. Does Tagawa have discretion to determine what is an imperfection? How is imperfection defined? You're outside. You're in nature. Is this a hole that was dug by a gopher? I mean, how do you define imperfection? Great question, and the government has given us zero knowledge, zero information on that. What is an imperfection? In my mind, it's a hole. It's something that affects the playing quality, the ability to allow people to enjoy what the purpose of the field was. Go play on it in a safe manner, right? So in my mind, a hole, one foot, needs to be filled with rock or soil. Would a three-inch hole need to be filled? I think it would be, given the purpose of the field, yes. Now, we don't know what Mr. Tagawa is thinking because all he put in his two-page declaration was, I've been mowing lawns since I was 13, and I was trained to inspect, and if I find something, mark it and fill it. What was the purpose of the field, and who stated that purpose? I believe in Ms. Alberti or one of the declarations, I don't know if it's the purpose, but everybody agrees it's kind of a multi-purpose field that's used for people to play, for recreation, picnics. I don't think they limit it in any way other than, here's the field, go enjoy it. I mean, because it's flat and it's grassy, people do those kind of things on it, play sports, fly kites, drive vehicles on it, picnic on it. And you're not claiming in this case that Mr. Tagawa had notice of the imperfection, correct? No, that's correct. So, again, once, just flipping back real quick, so there's two problems. The one is lack of discretion. The other big problem is routine maintenance does not sustain the DFE. If you are talking routine maintenance like we are having here, the DFE does not apply. That is in Turbush again. Matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy weighing actions or decisions. And that is absolutely clear with Mr. Tagawa. He did not balance any policy considerations whatsoever, at least not by his declaration or Ms. Alberti's declaration. That's kind of the death knell for DFE. You must do that. There must be a choice and you must balance policy. You want to save any time for rebuttal? Yes, I would. Thank you. Thank you. Mr. Schwab, good morning. Good morning. Good morning and half a day, Your Honors. May it please the Court. I am Michael Schwab here on behalf of the United States, and I'm here today representing the National Park Service's American Memorial Park in Saipan in the Northern Marianas Islands. If I could, I'd like to focus, Your Honors, on two issues today, two facts. Number one is a hole, quote, not visible to a normal person using reasonable care. Number two, the judge below worked diligently to consider other facts and theories and still found discretionary function to bar this claim. The Court worked through it. The Court demonstrated it looking at other things that could have been considered. For instance, the fact that no one found a hole and the picture that was shown by the plaintiff didn't look like a hole. The Court went on and said, well, what if it's an undulation? What if it's a defect in the subsoil? The Court considered all of that and still eliminated it under the discretionary clause. The Court demonstrated it, explored it, but they did not use the word that we all wanted to hear, which is the amendment. The Court didn't say amendment. The question here, one of the questions before the Court is, when a judge does all the work they're supposed to do to look at alternatives before they dismiss, does the label matter? Turning to the hole, a visible hole, a not visible hole to a normal person using reasonable care. That's a quote from the plaintiff's administrative claim. An administrative claim informs the government as to what they're up against, what they're being claimed against for negligence. That's, of course, in the Form 95, which was submitted by the plaintiff. It's required to be submitted within two years. Otherwise, they lose their claim. Counsel, what do you make of counsel on the other side's position that routine maintenance doesn't give rise to the DFE? There's nothing routine about a hole that cannot be seen by a normal person using reasonable care. The standard they're trying to hold us to, Mr. Alba, is a normal person using reasonable care. They want an extra standard, something above and beyond, something that would get down on the hands and knees, maybe, and look for hidden holes, things that aren't visible. We're not providing a putting green here, and we're not providing astroturf. We're providing a natural setting that's exposed to multiple uses, that's open to people at all times, that has erosion, that has animals, that might have different types of grass that might rot or have different levels. That, I think, is not your ... Your reasonable person would not see the hole that the plaintiff claims in this. Is the reason that they couldn't see the hole because the maintenance wasn't being done? That's not alleged, and there's no possible fact of that. In fact, the facts were exactly the opposite that were presented to the court. Of course, keep in mind that the court and all the parties in this are very familiar with this park and this grassy area. It's the center of this community. A lot of events occur there. If you look at the excerpts of record at 52, plaintiff's counsel talks about spending time there with his family. Everyone's familiar with it. The policy of the Park Service is to send out Mr. Tagawa and people like him and use their discretion, what needs to be fixed, what needs to be done, but it has to be visible. Well, hold on a second here, just to back up. The visibility issue, it seems from the administrative claim, is more Mr. Chang explaining why it was that he fell in the hole, that he didn't avoid it. I'm not sure that answers the question of whether Mr. Tagawa should have noticed the hole given his duty to routinely maintain it. I guess that leads to the broader question of why wasn't this ... He says in his declaration he routinely maintains the field. Maybe it was reasonable not to maintain this particular hole for some factual reason, but in what sense was this discretionary? Well, look at this further. He's never found that hole. That hole's never been found. What would it take to find that hole? Something beyond a person using reasonable care. Get down on your hands and knees, find an expert. Again, like you would do for, say, a putting green, or you would do where you lay astroturf. Make sure it's perfectly flat under its surface. So he's asking for something below the surface, and that's not what the Park Service provides. There's over 400 parks in our national system, and you offer grass that is exposed. It's part of the experience. And there can be, as the court acknowledged, there can be variations under the surface. And if those variations come to the attention of a normal person using reasonable care who is maintaining that area, they will fill that hole, or they will fix it. Or they may even put up a sign saying, hey, there's a lot of holes here. But that's not the case here. Is this a purely natural area? In other words, some of our national park cases involve a trail or some other undisturbed area and an accident that happens on that. Is this essentially a man-made or a natural? How do you describe it in those terms? It's left in its natural state, mowed and maintained. But it's originally, you know, Saipan went through World War II. Everything there has been, at one point or another, bulldozed, flattened, or fixed. And I think the park is the same. Somebody set up that park. It's quite a few acres. And that particular area is probably, at some point, flattened out or made the way it is. But I gather it was not done so as part of the park design. It was done so as part of the park design. The park design has areas of grass. No, no, but I mean it wasn't bulldozed as a matter of park design. You just, as I understand the facts, and you can correct me if I'm wrong, this is just a grassy area that was left in the state that was found, right? I can't say that for sure because I wasn't there at the beginning of the park service. But I'll say as long as anyone's memory, it's just been there. It's been in its natural state, offered to the public at all hours, used for events, and well maintained. I guess I'm still unsure. No, go ahead. I guess I'm still unsure where you see the line between routine maintenance and something else. Because the claim here is that the hole was a foot deep. And I don't think people expect in walking in a grassy area to encounter a one foot deep hole. It would seem like the kind of thing, if the park service was aware of it, that they would want to fix it. So why wasn't this just possibly negligence in the routine care of the grass? Because a hole not visible to a normal person using reasonable care, you'd be asking the park service to start employing or using people that go beyond normal people and that go beyond reasonable care. You'd be asking for something like a survey, someone to go over and maybe push with their hands or use a stick or some sort of other thing to look for non-visible defects below the surface of the grass. And that's a level that I don't think we can require in a tort action. I think that's the point where you start to interfere with the discretionary function of the park service and what they're trying to offer. And I think it's interfering with the discretion of Mr. Tagua, who's there to do good maintenance as a normal person using reasonable care. Yeah, I guess I just am questioning whether this is sort of assuming the answer to the case. Because his position is that when imperfections are discovered, he deals with them. This was an imperfection. He didn't deal with it. And there's a question as to whether that's reasonable or not. But why isn't that just a factual question as opposed to an issue that precludes liability altogether? Your Honor used the key word, discovered. Never been discovered. Hasn't been discovered since. Nobody's found this hole. And at one point, the plaintiff took a picture of something and showed it to the court, and it doesn't look like a hole. That's okay. The court went ahead and assumed there was a hole there anyway. But a non-visible hole. A non-visible hole from a normal person using reasonable care. Does that answer the question, Your Honor? No, I understand your position. So this isn't—we're not talking about normal maintenance. We're not talking about routine maintenance. That was admitted. That was, I think, submitted by the United States in this case. So we're talking about something that goes beyond that. And I think when you go beyond that, when you're expecting something—I'm not sure. I'd have to speculate. Maybe getting down on your hands and knees and checking underneath the grass. Or using some sort of device that could tell you if there are defects below the grass. I don't think that can be required of the United States. And the basis of this claim is a hole not visible to a normal person using reasonable care. I'm not sure that I agree that the district court operated under those assumptions. It seems that the district court more took the plaintiff's allegations in the complaint, accepted them as true. Absolutely. And I'm not sure that the plaintiff's characterization in the complaint is the same as you lay it out in terms of the invisibility or lack of detection, the ability to detect the hole. Does Your Honor doubt that he said in his administrative claim that this was a hole that was— Oh, I've read the claim. I've read the claim, but it's here on a motion to dismiss, right? It's here on a 12B-6. So we are using a hole that is not visible. That's established. We're not talking about something that was open and notorious, something that could have been seen by a normal person. So that is the basis of this case, and I think that's where both the court and the United States have a dilemma here, trying to understand, struggling to say, how can this survive a summary or a dismissal? And the court did struggle with that. The court took as true that there's a hole there. The court even went outside the complaint and said, what if there's just undulations, imperfections? And the court still said it would interfere with the discretionary function. Did I fully answer your question, Your Honor? No, I understand your position. Thank you. Well, Your Honor, again... Again, I want the court to concentrate on the fact that there's a hole not visible to a normal person using reasonable care as the basis for why the United States is alleged to be negligent here. And then I also want the court to concentrate on the fact that the judge worked diligently to consider other facts and theories and still found that the discretionary function barred this claim. Thank you, Your Honors. Thank you. We'll hear rebuttal. Thank you, Your Honor.  The point about why we're here is this is about the application of DFE, the discretionary function exception to the Federal Tort Claims Act. We're not here for negligence yet. What the government must do when it comes up here is explain to the court how Mr. Tagawa had discretion. What choices did he have? And in addition to those choices, did he balance policy of the park somehow? The government's focus, obviously, is on some of the language in the administrative claim and the visibility of the hole, so why don't you address that? Yeah, I mean, we haven't done a lot of discovery in this, but there's a picture of my client's foot over what looks like a hole. He didn't put it in because his ankle was framed is the explanation. But the government, in their brief, concedes there was a hole. Both parties concede there's a hole. It's just what is the extent of the visibility on that? In my mind, Mr. Tagawa is instructed, mow the lawn on a daily basis, almost, except three days. He's mowing that because grass grows, and they want to keep it short, and they want to make sure that it's flat and any imperfections are filled. Well, that's not precisely true. They say if you see an imperfection, take care of it. That's a little bit different from conducting a thorough inspection for an imperfection. Yeah, that's true. Mowing was his maintenance, if you will. If you see something, fix it. But there's a little bit of difference between that and, say, let's say a schoolyard that's planted, and people are inspecting it to make sure the kids aren't falling through everything. There's a little bit of a degree of difference in terms of the duty, I think. I think that's, again, that falls on the government's failure to fully explain what Mr. Tagawa was instructed. What was the policy? And then that intertwines with the DFE that says, you have to show some discretion, some choices. What were the choices that Mr. Tagawa was made? Well, he was only trained to inspect, mark, and fill. That's it. So what do you make of the declaration of the park superintendent saying, we don't maintain this in a pristine manner? Yeah, I mean, this field, I think, is almost in a pristine manner. Right, but the park superintendent says, no, we don't. Well, I think we're in a nitpick situation of what pristine means. I mean, American Memorial Park, this is a flat part of the field. In the old days, they removed big ironwood trees when I was there for the renovation. It wasn't a huge renovation, but the rest of it is natural, wild. There's coastal beaches. There's a big area for barbecue. Those places aren't maintained. A pristine condition is the grass grows over the sidewalk lots. I can't remember the name of the grass, but everybody wants some because it's like Bermuda. And so a pristine condition would be edge the sidewalks, make sure that the hedges that are around the garden or the circle of honor are trimmed, in my mind. This is, for lack of a better term, and because the government hasn't told us, near pristine, in my mind. It is mowed and made flat through inspection and filling in the imperfections by Mr. Tagawa. What has been the discovery in this case? We have the declarations. We have some photographs. What else has happened? If I can step back, Mr. Fitzgerald was the original attorney on this, a friend of mine. He did the complaint. He did everything. He became ill, and at one point, I kind of associated in but had very little to do with the case. He did initial disclosures, and there was some informal discovery. Have there been depositions or anything like that? No, no, no. Because at one point, the government figured out, it's like I want to do a motion to dismiss 12B1. I'm like, okay, but then you'll see on the record a lot of stipulations moving the scheduling conference. That was done because we were waiting for the motion to dismiss, and then we were waiting for the court to rule on the motion to dismiss. Nobody wanted to really do discovery or anything until we got a solid answer as to if the DFE applied or not. If we don't have jurisdiction, then that's it. You're entitled to discovery as to the jurisdictional aspect.  This seems to fall within, purely within that, because you're arguing about what he was supposed to do or not supposed to do. They say, look, this is an informal inspection, not a formal inspection. Your argument is that there was a higher standard that was a more formal obligation, and that seems to be perhaps a factual issue that would bear on the jurisdiction. Yeah. I mean, you may have decided not to do it for a variety of reasons. I'm just saying you had the opportunity if you wanted to as to the government. Yes, we did. Again, I think both parties just wanted to get this resolved before going into that.  Frankly, once the motion was filed and I saw Mr. Tagawa's declaration, they just put themselves outside or out of the DFE. Counsel, I wanted to ask. Mr. Schwab made a big deal about the fact that the hole was not visible. Is it a big deal? Do we care at this stage? Not for the DFE. It's not. Why? Not for the purpose we're here. It has nothing to do with that. The only thing that I need to do as a plaintiff at this stage is make sure the allegations in the complaint are not clearly within the DFE. They're not. The allegations are failure to inspect, failure to maintain. Failure to warn, admittedly, is a weak, a much weaker. Have you appealed that? Have you appealed that, the failure to warn issue? No, because it's just . . . Oh, yes. In the brief, we talk about the case Summers v. U.S. It's an old case, and it talks about failure to warn and the fact that in Summers, this little girl burned her feet on some hot coal. Basically, it came down to the people that were in charge of the beach and in charge of the signage didn't know that there were hot coals there at all. The Summers court said, well, if you didn't know that it existed, if you didn't know at all, then you cannot have any discretion. There can be no policy-based balancing because you didn't know. Then you have Childers. Yes. Childers is a failure to warn case, so you don't have to. I want to be clear. I'm sorry. I keep bumping. Summers in Turbush was . . . They basically said, look, that is pre . . . I'm sorry. The name of the Supreme Court escaped me. Anyway . . . I have to find it. It said, look . . . We've taken you over your time. Yes, I'm sorry. I want to just check with my colleagues if they have additional questions for you.  All right. I think we'll conclude the argument since we've gone way over, but I want to thank you both for your presentations this morning, and this case is submitted. Thank you very much.
judges: THOMAS, BRESS, ALBA